IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>NICHOLE RENAE HERTER,<br><br>　　　Debtor.<br><br>────────────────<br><br>R. SAM HOPKINS, Trustee,<br><br>　　　Plaintiff – Respondent,<br><br>v.<br><br>IDAHO STATE UNIVERSITY CREDIT UNION; and DAVID HERTER,<br><br>　　　Defendants – Appellants. | Case No. 4:12-cv-180-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court is Idaho State University Credit Union and David Herter's appeal from the bankruptcy court's judgment in favor of the Chapter 7 bankruptcy trustee. The bankruptcy court held that the trustee could avoid debtor Nichole Herter's transfer of property to her ex-husband, appellant David Herter. The bankruptcy court also held that the trustee could recover the transferred property for Nichole's bankruptcy estate, free and clear of the credit union's lien on the property.

The Court heard argument October 19, 2012 and requested supplemental briefing. After considering the oral and written argument, the Court now issues its decision. For the reasons explained below, the Court will affirm bankruptcy court's decision.

## BACKGROUND

In 2002, David and Nichole Herter purchased a home in Pocatello, Idaho. Roughly six years later, the Herters prepared their own stipulated divorce decree, signed it, and filed it with the state court. Their home was community property and the divorce decree provided it would be sold and the proceeds split equally.

Before the state court entered the divorce decree, however, David and Nichole filed separate bankruptcy petitions. David filed first, on November 7, 2008; Nichole filed on November 19, 2008. The state court entered the divorce decree on November 26, 2008. Both Herters listed the home on their bankruptcy schedules, indicating that Midland Mortgage and appellant Idaho State University Credit Union had loans secured by the home. David estimated Midland Mortgage's senior lien at around $61,000 and the credit union's junior lien at around $27,000, for total secured debt of roughly $88,000. (Similarly, Nichole estimated the secured debt on the home at $88,969.)

David claimed a homestead exemption in the property for the full amount allowed under state law – $100,000. *See* Idaho Code § 55-1002; § 55-1003. Nichole, on the other hand, indicated she intended to surrender the property. Apparently, the plan was for David to live in the house because he had custody of the couple's minor child.

In both bankruptcy cases, the trustee stipulated with the credit union that the automatic stay could terminate as to the property. *See Appendix to Appellants' Opening*

*Brief,* Dkt. 10 ("Appx."), at 108, 122.  Such a stipulation made sense from the trustee's perspective because there was no equity in the home to liquidate for creditors.  Both Herters listed the home's value as $104,000 and, as already noted, the property was encumbered by around $88,000 in secured debt. Additionally, by claiming the $100,000 state-law homestead exemption, David protected up to $100,000 in the home's value from the reach of creditors.

Within a few weeks of these stipulations, Midland Mortgage (the senior lienholder) moved for relief from stay in David's case.  The trustee did not object, and the Court entered an order granting relief from stay in February 2009 – the same day David's bankruptcy case closed.  *Appx. 139.*  A few months later, in May 2009, Midland filed a substantially identical motion for relief from the stay in Nichole's case.  The trustee again did not oppose the motion, and the Court granted it in June 2009.  *Appx.* 160.

After obtaining relief from the stay in Nichole's case, Midland began foreclosure proceedings by recording a notice of default and mailing a notice of trustee's sale to Nichole and David.  The bankruptcy trustee was not notified.

The foreclosure sale was scheduled for November 3, 2009.  A couple of months before the scheduled sale, however, David refinanced the home by borrowing $102,000 from the credit union.  He used the proceeds from this new loan to pay off the two existing loans.  As part of the refinancing, on September 1, 2009, Nichole signed a quit-claim deed, conveying her interest in the property to David.  David also executed a new deed of trust in favor of the credit union.

In October 2010, the trustee commenced an adversary action in Nichole's case,

seeking to avoid Nichole's quit-claim of her interest in the property to David.  The trustee also sought to avoid the credit union's new lien on Nichole's share of the property.  The bankruptcy court entered judgment in the trustee's favor, allowing him to recover Nichole's undivided one-half interest in the property – free and clear of any lien created by the credit union's new deed of trust.  This appeal followed.

## STANDARD OF REVIEW

District courts review bankruptcy court decisions in the same manner as would the Ninth Circuit.  *See George v. City of Morro Bay (In re George)*, 177 F.3d 885, 887 (9th Cir.1999).  Thus, the Court reviews the bankruptcy court's conclusions of law de novo and its factual findings for clear error.  *Id*.  Mixed questions of law and fact are reviewed de novo. *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998).

## ANALYSIS

Ultimately, this Court must decide whether the trustee may avoid Nichole's quit-claim deed to David and then recover Nichole's interest in the property for her bankruptcy estate, free and clear of the lien created by the new deed of trust.  To decide these issues, the Court must first resolve the following questions:  (1)  Did Nichole's bankruptcy estate have an interest in the home?  (2) Did the bankruptcy court's four orders terminating the automatic stay authorize the quit-claim deed and the new deed of trust? (3) Is the bankruptcy trustee estopped from seeking to avoid the quit-claim deed?  (4) Did the bankruptcy court improperly consider title insurance in ruling on the merits?  Additionally, the Court must decide appellants' alternative argument that, if the trustee prevails on the above issues, appellants are nonetheless entitled to an administrative

expense in the amount of $102,000.[1]  The Court will address each question in turn.

## 1.  Nichole's Interest in the Property

The Court concludes that the bankruptcy court correctly determined that Nichole's bankruptcy estate received a one-half, tenant-in-common interest in the home when David's bankruptcy case closed.

### A.  Bankruptcy Code § 541(a)(2)

The starting point for this analysis is Bankruptcy Code § 541.[2]  Under this section, when a debtor files a bankruptcy petition, a bankruptcy estate is created, consisting of all property in which the debtor has a legal or equitable interest.  § 541.  Further, the bankruptcy estate includes the community property interests of *both* spouses (not just the debtor-spouse) to the extent the community property is "under the sole, equal, or joint management and control of the debtor . . . ."  § 541(a)(2).

Here, David filed his bankruptcy petition before Nichole did and, at the time he filed, the couple's divorce decree had not been entered and their community-property home had not been sold.  Thus, the home remained community property and the entire home was brought into David's bankruptcy estate.  *Dumas v. Mantle (In re Mantle)*, 153 F.3d 1082, 1085 (9th Cir. 1998) ("all community property not yet divided by a state court at the time of the bankruptcy filing is property of the bankruptcy estate").  Nichole's estate, therefore, does not include any part of the home.  *See id.; In re Bauer,* 2005 WL 4705284 (Bankr.

---

[1] As explained below, the Court will not reach appellants' argument related to subrogation and contribution.

[2] Unless otherwise noted, all statutory references are to the United States Bankruptcy Code.  11 U.S.C. §§ 101-1532.

D. Idaho 2005); *see generally* 5 *Collier on Bankruptcy* ¶ 541.11[4], at 541-67 (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2012).

### B.  Bankruptcy Code § 554(c)

The home passed through David's bankruptcy without being administered. Appellants point out that under Bankruptcy Code § 554(c), unadministered property is abandoned "to the debtor" when a bankruptcy case is closed.  Thus, appellants argue that when David's case closed, David got all of the property – including Nichole's interest in the home.

But if this view were accepted, David would get more than he had when he filed bankruptcy.  The more logical result is that David got what he had immediately before he filed his bankruptcy petition – his share of the community property.  As the Ninth Circuit has explained, "[u]pon abandonment, the debtor's interest in the property is restored *nunc pro tunc* as of the filing of the bankruptcy petition."  *Catalano v. Comm'r*, 279 F.3d 682, 685 (9th Cir. 2002); *see also Brown v. O'Keefe,* 300 U.S. 598, 602-03 (1937) (title to assets abandoned by the trustee passed to the debtor as if no bankruptcy had been filed).

The wrinkle is that by the time David's bankruptcy closed, David and Nichole were divorced, so there was no community to be had for the community-property home.  As noted above, the state court entered the divorce decree after both David and Nichole filed their bankruptcies.  Appellants argue that the automatic stay in Nichole's case, § 362(b)(2), and the discharge injunction in David's, § 524(a)(2)-(3) would still prevent the community property from being divided and distributed to each spouse.  Neither argument is persuasive.

### C. Bankruptcy Code §§ 362(b)(2) and 524(a)(2)-(3)

First, the automatic stay did not prevent the divorce decree from ending the marriage, but it did prevent the decree from dividing community property within David's bankruptcy estates.  § 362(b)(2)(A)(4).  As set forth in § 362(b)(2)(A)(iv), "[t]he filing of a petition . . . does not operate as a stay — . . . . (A) of the commencement or continuation of a civil action or proceeding — . . . . (iv) for the dissolution of a marriage, *except to the extent that such proceeding seeks to determine the division of property that is property of the estate*." (emphasis added; internal paragraph divisions omitted).  So while David's bankruptcy case was pending, the community-property home could not be divided.  When David's bankruptcy closed, however, nothing prevented that.

Appellants argue that if the automatic stay in David's case prevented the property from being divided, so too should the automatic stay in Nichole's case.  But Nichole's case never included the home in the first place.  As already explained, David filed first, meaning both David's and Nichole's community property interest came into his estate, not Nichole's.  The automatic stay prohibits a divorce proceeding from dividing property *within a bankruptcy estate*.  § 362(b)(2)(A)(4) (filing a bankruptcy petition stays "the division of property *that is property of the estate*") (emphasis added).

Below, the bankruptcy court first determined that the divorce decree became effective upon the closure of David's case but, on reconsideration, decided that the divorce decree was a nullity to the extent it sought to divide the property.[3]  Then,

---

[3] The parties do not dispute this finding.  *See Appellants' Opening Brief*, Dkt. 9, at 6 ("The parties agree and the Bankruptcy Court so ruled, that this State Court order [the divorce decree] was 'void *ab initio*' in violation of the 362(a) bankruptcy stay and had no effect on the

assuming the decree was ineffective to the extent it sought to divide the couple's community property, the bankruptcy court correctly looked to state law to fill the gap. *See generally In re Mantle*, 153 F.3d at 1084 (to determine whether property is community property, and thus included in the bankruptcy estate, the Court looks to state law). Idaho law provides that if a divorce decree does not dispose of community property for some reason, the spouses hold that property as tenants in common. *See, e.g., Quinlan v. Pearson,* 225 P.2d 455, 456 (Idaho 1950); *Carr v. Carr,* 779 P.2d 422, 428 (Idaho Ct. App. 1989) ("Generally, community property not divided in a divorce decree is held by the former spouses as tenants in common or joint owners, subject to partition upon demand of one of the parties."). Thus, upon the closure of David's bankruptcy case, Nichole acquired a tenant-in-common interest in the home.

Appellants also argue that the discharge injunction in David's case would prevent division of the property. The discharge injunction, codified in Bankruptcy Code § 524 "operates as an injunction against [actions] to collect, recover or offset any [discharged debt] as a personal liability of the debtor." § 524(a)(2). In this case, there was no action to collect, recover, or offset a discharged debt.

Appellants also point to a sub-section (a)(3) of § 524, but that sub-section, which prevents actions to recover on community claims from community property acquired post-petition, is not applicable here.

In sum, then, neither the automatic stay nor the discharge injunction prevented the division of property by operation of state law. The next question is whether Nichole's

Property.").

newly formed separate property interest in the home became part of her bankruptcy estate under Bankruptcy Code § 541(a)(5).  The Court concludes that it did.

### D.  Bankruptcy Code § 541(a)(5)

Normally, the date the bankruptcy petition is filed determines whether property is, or is not, part of a debtor's bankruptcy estate. See § 541(a)(1).  Under § 541(a)(5), however, certain types of property interests acquired within 180 days after the filing of a bankruptcy petition also become property of the estate.  Among those after-acquired interests are those the debtor acquires "as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree." § 541(a)(5)(B).[4]

Here, Nichole received her tenant-in-common interest in the home within 180 days of filing her petition.  She did not, however, receive her interest in the home directly as a result of the divorce decree.  As already explained, although the decree effectively ended the marriage, it was ineffective the extent it sought to divide the couple's community property.  So Nichole obtained her interest in the property by operation of law – namely, Idaho law providing that if the divorce decree fails to dispose of community property,

-------

[4] In full, § 541(a)(5) provides that the bankruptcy estate includes

[a]ny interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date –

　　(1) by bequest, devise or inheritance;

　　(2) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

　　(3) as the beneficiary of a life insurance policy or death benefit plan.

each spouse gets a tenant-in-common interest in the property.  *See, e.g., Quinlan,* 225 P.2d at 456.  The question is whether that indirect method of obtaining the property is enough for § 541(a)(5) to apply.  The Court concludes it is.  The statutory language says that if a debtor obtains property "*as a result of*" the divorce decree, then the property is part of the bankruptcy estate.  Here, Nichole ultimately got her interest in the property *as a result of* the divorce decree, given that the decree triggered the operation of law allowing her to obtain a 50% tenant-in-common interest in the home.  *Cf. Cordova v. Mayer (In re Cordova)*, 73 F.3d 38 (4th Cir. 1996) (applying § 541(a)(5); "[b]ecause she acquired the fee simple interest as a result of the entry of a divorce decree within 180 days of the filing of her petition, it became part of the bankruptcy estate"); *In re Sivley*, 14 B.R. 905 (Bankr. D. Tenn. 1981) (applying § 541(a)(5); "Mrs. Sivley's interest as a tenant in common came into the estate as a result of the divorce within 180 days after bankruptcy.").

## 2.  The Scope of the Lift-Stay Orders

The next question is whether the bankruptcy court's orders lifting the stay authorized Nichole and David to effect refinancing-related transfers (*i.e.*, the quit claim and the new deed of trust).

This question involves the interaction between two Bankruptcy Code sections – § 362 and § 549.  Section 362 codifies the automatic stay.  The purpose of the automatic stay is "to protect debtors from all collection efforts while they attempt to regain their financial footing."  *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992).  Section 549, on the other hand, deals with *debtor*-initiated transfers of property.

Under this section, the trustee may avoid post-petition transfers of estate property.  § 549. In contrast to § 362, the purpose of § 549 "is to provide a just resolution when the debtor himself initiates an unauthorized postpetition transfer."  *40235 Wash. St. Corp. v. Lusardi*, 329 F.3d 1076, 1081 (9th Cir. 2003).  "The general rule in such situations [i.e., when the debtor initiates a post-petition transfer] is that the trustee is authorized to avoid the transfer in order to protect the creditors."  *Id.   See generally Collier* ¶ 549.01 at 549-3 (explaining that § 549 deals with the goal of distributing the estate, which "can be as easily frustrated by postpetition transfers of estate property as by prepetition transfers"). There are limitations on the trustee's power to avoid post-petition transfer, however.  If, for example, the bankruptcy court authorizes a post-petition transfer, the trustee cannot avoid it.  *See* § 549(a)(2)(B).

Here, neither David nor the Credit Union specifically asked the bankruptcy court to authorize the refinancing or the related quit-claim.  Instead, they relied on the bankruptcy court's orders granting relief from the automatic stay as to the property.  They argue that these orders authorized Nichole to transfer her interest in the property to David.  They also argue that if a lift-stay order permits foreclosure, it logically must permit refinancings as well.  In fact, they generally argue that since the automatic stay bans most everything, if a court grants relief from the stay, then anything goes.  As the appellants put it: "Appellants were authorized under the stay termination orders to perform any action related to the Property as extreme as a foreclosure sale or as liberal as doing nothing and everything in between, including refinance and quitclaim deed, subject only to the encumbrance limits secured against the Property."  *Appellants' Opening Br.*, Dkt. 9, at 21.

The Court is not convinced.

First, a bankruptcy court's order granting relief from the stay is strictly construed. *See Griffin v. Wardrobe (In re Wardrobe)*, 559 F.3d 932, 935 (9th Cir. 2009).  One reason these orders are strictly construed is to ensure that the bankruptcy court is fully informed as to the potential effect of any order granting relief from the automatic stay. *Id.*  Here, the credit union's stipulations for relief from stay did not specifically mention any quitclaim or refinancing.  They just recited that the property was encumbered by almost $90,000 in liens and was worth around $104,000.  *See Appx.* 95, 109.

Similarly, Midland's motions for relief from stay did not specifically inform the bankruptcy court of a contemplated refinancing transaction between David and the credit union, or any associated quit-claim.  Rather, Midland asked for relief from the stay "to allow Petitioner to take the legal actions provided in its loan documents including foreclosure or recording a deed in lieu of foreclosure,[5] and all proper relief." *Appx.* 125, 146.

Further, as the Trustee points out, each of the bankruptcy court's orders grants relief only "to" the "Movant" – with the "movant" being defined as the credit union or Midland – not to the debtor or anyone else. *See Orders re the Credit Union's Stipulations,* Appx. 108 and 122 ("relief from automatic stay is granted *to Movant* as to the Debtor(s), Estate, and the Property") (emphasis added); *Orders Granting Midland's Motions for Relief from the*

---

[5] Though the issue is not before the Court, the Court has some reservations as to whether the order granting this motion would actually allow a deed in lieu of foreclosure.  The order grants relief from the stay only "*to Movant* . . . ." but in a deed-in-lieu transaction, the debtor (not the movant) would be transferring property out of the estate. *See Orders Granting Midland's Motions*, *Appx.* 139, 160.

*Automatic Stay, Appx.* 139, 160 ("The automatic stay . . . is hereby terminated *as to Movant* and to the subject property . . . .") (emphasis added).  When these orders are strictly construed, they did not authorize Nichole to transfer her rights in the property to David. Nor did they authorize David to encumber the property with a new lien.

The second reason the Court concludes that the lift-stay orders did not authorize the refinancing transaction relates more fundamentally to the nature of § 362.  "Section 362's automatic stay does not apply to sales or transfers of property initiated by the debtor."  *Schwartz*, 954 F.2d at 574.  So if the stay is lifted, it does not mean the debtor is authorized to transfer estate property.  Those transfers are governed by § 549(a).  *See id.; see generally Collier* ¶ 549.02A (discussing the interplay between §§ 362 and 549).  In other words, foreclosure and refinancings are fundamentally different in the sense that creditors initiate foreclosures, while debtors initiate refinancing. *See Hopkins v. Suntrust Mortg., Inc. (In re Ellis)*, 441 B.R. 656, 662-63 (Bankr. D. Idaho 2010).  The cases relied upon by appellants for the proposition that debtors are free to initiate any transfers of property after a lift-stay order are not persuasive because in those cases, foreclosures proceeded after a lift-stay order – not debtor-initiated refinancings and associated transfers.  *See, e.g., Sullivan Central Plaza I, LTD v. Bancboston Real Estate Capital Corp. (In re Sullivan Central Plaza I LTD),* 935 F.2d 723 (5th Cir. 1991) ("In practical terms, the lifting of the stay and vacation of the TRO constituted authorization to conduct a foreclosure sale as provided under state law."); *In re Frank*, 80 B.R. 19, 20 (Bankr. E.D.N.Y. 1987) ("Once a bankruptcy court vacates an automatic stay permitting a creditor to proceed in state court to enforce its rights, further approval of this court is not

necessary.").

In sum, the bankruptcy court's orders lifting the stay did not authorize Nichole to quitclaim her interest in the home to David, nor did they authorize David to grant a deed of trust to the credit union.

**3.  Estoppel**

Appellants next argue that the trustee should be judicially or equitably estopped from avoiding the quit-claim deed and the credit union's new deed of trust.  A bankruptcy court's decision to invoke judicial or equitable estoppel is reviewed for an abuse of discretion.  *See Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1197 (9th Cir. 2012) (regarding judicial estoppel); *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1111 (9th Cir. 2006) (regarding equitable estoppel).  When reviewing for abuse of discretion, the Court will reverse only if it has a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  *Smith v. Jackson*, 84 F.3d 1213, 1221 (9th Cir.1996).  The bankruptcy court did not abuse its discretion.

Judicial and equitable estoppel are similar because, in the broadest sense, they both prevent litigants from taking a legal position inconsistent with an earlier one.  But they have different purposes and requirements.  Judicial estoppel exists to "protect the courts from the "improper use of judicial machinery" through a party's attempt to take advantage of both sides of a factual issue at different stages of the proceedings.  *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001).  So courts invoke judicial estoppel "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of

"general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings," and to "protect against a litigant playing fast and loose with the courts.'" *Hamilton v. State Farm Fire & Casualty Co.*, 270 F.3d 778, 782 (9th Cir. 2001). Equitable estoppel, in contrast, exists to protect the parties – not the courts.  A critical difference between equitable estoppel and judicial estoppel is that a party asserting equitable estoppel must detrimentally rely on the other party's conduct. No such reliance is necessary to invoke judicial estoppel.

Here, although appellants generally mention both doctrines, they do not discuss the distinctions between them, and they repeatedly argue that they detrimentally relied on the trustee's conduct – which is specific to equitable estoppel.  They also take the time to spell out the elements of equitable estoppel.  They do not, by contrast, specify the differing elements of judicial estoppel or argue that they have met these elements.  The Court will therefore confine its analysis to equitable estoppel.

The elements of equitable estoppel are

(1)     the party to be estopped must know the facts;

(2)     he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3)     the party asserting estoppel must be ignorant of the true facts; and

(4)     the party asserting estoppel must rely on the other's conduct to his injury.

*United States v. Georgia-Pac. Co.*, 421 F.2d 92, 96 (9th Cir. 1970).  More generally appellants must show that the trustee has taken inconsistent positions.  *Id.* ("Equitable estoppel prevents a party from assuming inconsistent positions to the detriment of another

party, . . . .").

The bankruptcy court did not find any inconsistency in the trustee's conduct.  To reach this conclusion, the bankruptcy court first noted two basic principles:  (1) bankruptcy trustees have an ongoing statutory duty to maximize the bankruptcy estate for the benefit of creditors; and (2) a "trustee's motivation to administer an interest in property (or not) may also change as a bankruptcy case progresses, particularly if there is an increase in equity available to the bankruptcy estate."  *June 21, 2011 Bankruptcy Court Decision,* Dkt. 36 in Case No. 10-8093-JDP, at 32, *citing Gebhart v. Gaughan (In re Gebhart)*, 621 F.3d 1206, 1211-12 (9th Cir. 2010) *and Hyman v. Plotkin (In re Hyman)*, 123 B.R. 342, 384 (9th Cir. BAP 1991).  In view of these principles, the bankruptcy court found that although the trustee took different positions, he was nonetheless consistent because his positions changed only in response to a change in the underlying facts.

Appellants argue that the trustee induced this change of facts through his conduct.  More specifically, appellants say that the trustee lulled them into believing he had no interest in the property which, in turn, induced them to refinance the property without worrying about whether the trustee would seek to administer the property in Nichole's case.  Appellants point out that the trustee stipulated to relief from stay (or did not oppose motions to lift the stay) four separate times.  He also allowed David's bankruptcy case to be closed without administering the property.  Further, Nichole had indicated she intended to surrender the property, and the trustee did not ensure that she followed through on that intention.  Thus, according to the appellants, the trustee acted inconsistently when he sprang into action after the refinancing and sought to avoid the new lien the property –

particularly where the property remained encumbered by the same amount of debt.

To be sure, the result in this case seems unfair.  One-half of the Herters' home came into Nichole's bankruptcy estate with almost no equity.  After the refinancing, nothing really changed.  The property remained encumbered by roughly the same amount of secured debt.  Yet, at the end of the day, the trustee was able to recover Nichole's half of the property free and clear of any liens, thus garnering a significant windfall for Nichole's bankruptcy estate.

But the appellants' position is not without its difficulty.  After all, the trustee did not ever say – specifically or affirmatively – that he was abandoning his interest in the property in *Nichole's* case.  Nobody forced that issue.  As the bankruptcy court pointed out:

> David and ISUFCU did not need to "guess" about whether the Trustee intended to administer, or to abandon, the Property [in Nichole's case]. Any uncertainties about Trustee's goals could have been quickly dispelled if they, or Nichole, had simply filed a motion to deem the Property abandoned from Trustee's reach before the postpetition transfer occurred. *See* § 544(b). That they did not resort to this ready remedy weighs heavily against David's and ISUFCU's claim of inequity.

*June 21 Decision*, Dkt. 36 in Bankruptcy Case No. 10-8093-JDP, at 34 n.13.  On this record – and although this Court might have decided to invoke equitable estoppel to prevent the trustee from so acting – the Court cannot conclude that the bankruptcy court abused its discretion in reaching the opposite conclusion.  The Court will therefore affirm the bankruptcy court's equitable estoppel ruling.

## 4.  Title Insurance

Appellants next complain that the bankruptcy court improperly admitted and relied

on title insurance evidence in rendering its decision.  More specifically, at trial a witness testified that the credit union had obtained title insurance in connection with the refinancing.

The Court reviews the bankruptcy court's evidentiary decisions for an abuse of discretion.  *See United States v. Shirley,* 884 F.2d 1130, 1132 (9th Cir. 1989).  If the bankruptcy court did err in admitting the evidence, that error is subject to the harmless error rule.  *Id.*  An error is harmless if "it is highly probable that the error did not contribute to the judgment."  *Murray v. United of Omaha Life Ins. Co.*, 145 F.3d 143, 156 (3d Cir. 1998).

Appellants' title-insurance argument has some difficulty getting off the ground because appellants themselves introduced a settlement statement into evidence at trial, and that statement indicated title insurance had been issued.  *See Ohler v. United States*, 529 U.S. 753, 755 (2000) ("a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted").  Apparently, the parties had not focused on that particular part of the settlement statement.  *See Appx.* 172 (settlement statement).  But it caught the bankruptcy court's eye and at trial, the court questioned a credit union witness about title insurance – over appellants' repeated and strenuous objections.

On appeal, the trustee argues that appellants cannot complain about the title insurance evidence, since appellants introduced the settlement statement into evidence in the first place.  The trustee also argues that title insurance is relevant to the issues in this case.

The Court can decide the title insurance issue without resolving these threshold

disputes.  Even assuming that (1) appellants properly objected to the evidence and (2) title insurance was wholly irrelevant to this case, the bankruptcy court did not commit reversible error.  It is virtually impossible for a trial court to commit reversible error by admitting evidence in a non-jury trial.  *See generally* 11 Charles Alan Wright *et al., Federal Practice & Procedure* § 2885, at 454 (2d ed. 1995).  As Wright & Miller explain, "[i]n nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence." *Id.*  (footnotes omitted).  The appellate court will simply disregard the inadmissible evidence and hold its admission harmless if material and competent evidence supports the trial court's decision.  *Id.; cf. also, e.g., Evanow v. M/V Neptune,* 163 F.3d 1108, 1117 (9th Cir. 1998) ("because this was a bench rather than a jury trial, the risk of prejudice due to evidence of insurance is far less likely").

Here, the bankruptcy court did not once mention title insurance in its written decision, referring instead to other material and competent evidence.  *See Dep't of Water & Power v. Okonite-Callender Cable Co.*, 181 F.2d 375, 381 (9th Cir. 1950) (admission of allegedly incompetent evidence harmless where trial court did not once mention that evidence in its findings or opinion); *compare Wright v. Sw. Bank*, 554 F.2d 661, 663-64 (5th Cir. 1977) (trial court's error in admitting evidence not harmless because trial court relied on incompetent evidence in its written decision).   The Court also finds it significant that the bankruptcy court issued two lengthy decisions before trial – and thus before questioning the witness about title insurance.  The analysis in these pre-trial decisions largely forecast the bankruptcy court's post-trial written decision.  In fact, in rendering its

final decision, the bankruptcy court began its analysis with this heading: "Several of Defendants' theories and arguments have already been rejected by the Court." *Appx.* 23, *Dec. 15, 2011 Decision*, at 10. So although appellants insist the bankruptcy court's final "creative analysis and disposition were obviously colored" by title insurance evidence, the record does not support that assertion.

### 5. Administrative Expense

Finally, David and the credit union argue that the bankruptcy court erred by declining to treat their $102,200 claim as an administrative expense under § 503(b)(1)(A). The $102,200 claim is based on the money David paid to Midland and the credit union to satisfy the first two liens on the property. The bankruptcy court's ultimate decision to deny administrative-expense status to a particular claim is reviewed for an abuse of discretion. *See Kadjevich v. Kadjevich (In re Kadjevich)*, 220 F.3d 1016, 1019 (9th Cir. 2000).

When assets of a bankruptcy estate are distributed to creditors, claims for administrative expenses are among the very first unsecured claims that are paid. *See id.;* §§ 726(a), 507(a)(1), 503(b). The Bankruptcy Code provides a non-exhaustive list of allowable administrative expenses – including, under § 503(b)(1)(A), "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." § 503(b)(1)(A). These types of post-petition expenses are granted priority to encourage third parties to risk providing the goods and services necessary for a struggling debtor to reorganize. *In re Kadjevich*, 220 F.3d at 1019.

Claimants have the burden of proving an administrative expense, and the bankruptcy court has broad discretion to determine whether to grant such a claim.  *See Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995).  Further, to keep administrative costs at a minimum, "the actual, necessary costs and expenses of preserving the estate" under § 503(b)(1)(A) are construed narrowly. *In re Palau*, 139 B.R. 942, 944 (9th Cir. BAP 1992), *aff'd*, 18 F.3d 746 (9th Cir. 1994). Here, Appellants argue that the refinancing qualifies as an administrative expense under § 503(b)(1)(A) because they effectively "preserved" Nichole's share of the home within the bankruptcy estate, and the home will now be available for the benefit of creditors.

To prove an administrative expense under § 503(b)(1)(A), the expense must (1) arise from a transaction with the bankruptcy estate and (2) directly and substantially benefit the estate. *See, e.g, In re DAK Indus., Inc.*, 66 F.3d 1091 at 1094; *see generally* 4 *Collier on Bankruptcy* ¶ 503.06[3][a], at 503-27.   Appellants have not satisfied either part of this test.

**A.  Transaction with the Estate**

First, David's payment of these liens – and the refinancing transaction in general – did not involve the trustee.  In fact, the trustee did not even know about the refinancing transaction until after it had taken place.

Appellants cite an Idaho bankruptcy court decision, *In re TSB*, 302 B.R. 84 (Bankr. D. Idaho 2003), for the proposition that the transaction does not need to involve the trustee.  *TSB*, however, did not directly discuss this issue, and, more to the point, it could not override the binding Ninth Circuit authority cited above.

### B.  Benefit to the Estate

The second prong of this test – the benefit to the estate – is not expressly found in the statute.  Recall, the relevant part of the statute refers to the "actual and necessary" costs of preserving the estate; the phrase "benefit to the estate" is not used.  *See* § 503(b)(1)(A).  Nonetheless, "[t]he benefit analysis is a way of testing whether a particular expense was 'necessary' to preserve the estate."  *Collier* ¶  503.05[3][b] at 503-29.

In this case, the refinancing transaction, strictly speaking, was not necessary to "preserve" Nichole's interest in the property.  If the refinancing had not taken place, and Midland had proceeded to foreclose the property, then Nichole's estate would have received 50% of any remaining equity in the property.  Granted, at the end of the day, the refinancing ultimately bestowed a windfall on Nichole's estate.  But the windfall did not come about because David acted to "preserve" Nichole's interest in the property.  Rather, it came about only because the trustee was able to avoid Nichole's quit-claim transfer to David, and then recover that 50% tenant-in-common interest free and clear of the new lien.  Section 503(b)(1)(A) seems to contemplate a more direct benefit to the estate, rather than such a circuitous, contingent one.

Finally, the trustee has pointed out that appellants were self-interested in pursuing the refinancing.  The Court does not find this particularly relevant because "examining a claimant's subjective motivations is contrary to the policy underlying 503.  Indeed, creditors who transact business with an entity in bankruptcy are and should be motivated to do so not by a selfless desire to confer a benefit on the estate but by the reasonable and self-interested expectation of receiving compensation from the estate."  *Collier*

¶ 503.06[3][c], at 503-30 (criticizing *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*, 127 B.R. 374 (N.D. Ohio 1991) for examining the creditor's subjective motives to determine whether the transaction benefitted the estate).  Here, however, regardless of appellants' motivations, the refinancing transaction was not necessary to "preserve" Nichole's bankruptcy estate and, therefore, did not benefit the estate in the manner contemplated by § 503(b)(1)(A). As a result, this Court cannot conclude that the bankruptcy court abused its discretion in denying appellants' administrative-expense claim.

**6.  Subrogation and Contribution**

Appellants also argue, alternatively, that David is entitled to the equitable remedies of subrogation and contribution in exchange for paying off Midland's lien on the home. The bankruptcy court refused to rule on this argument because appellants raised it for the first time below in their post-trial brief.  *Appx. 35.*  (The post-trial briefs in this case were in lieu of closing argument after a bench trial.)  Preliminarily then, this Court must decide whether it will even reach the contribution and subrogation issue.

The bankruptcy court's refusal to consider an "untimely argument" is reviewed for an abuse of discretion.  *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918 (9th Cir. 1988).  In *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, the Ninth Circuit held that a district court did not abuse its discretion in refusing to consider a "belated argument" – made in a motion for reconsideration after the first phase of a bench trial and after the court had granted partial summary judgment to the other side – because "it would have been unfair to . . . [the opposing party] to address this issue

without prior notice or the opportunity to present evidence at trial to rebut the new factual allegations." *Id.* at 926.

In this case, David and the credit union did not raise any new factual allegations. They relied on the factual record, as it had already been developed, to raise a new legal argument. Still, this Court cannot conclude that the bankruptcy court abused its discretion in refusing to hear the argument. As the Trustee has pointed out, the appellants had various opportunities to raise the contribution and subrogation argument. Appellants answered the adversary complaint, which included five affirmative defenses and a counterclaim. None of these claims or defenses raised contribution and subrogation. The appellants also moved for summary judgment and then, after the bankruptcy court ruled against them, filed a motion for reconsideration which raised new issues, but not subrogation and contribution. Appellants also did not file a pre-trial memorandum, missing yet another opportunity to raise the subrogation and contribution points. Additionally, although appellants relied on the existing factual record in raising the new argument, if the Trustee had known earlier that appellants would raise this argument, he might have tried the case differently, perhaps by developing more or different facts to refute the new argument. *Cf. United States v. Patrin,* 575 F.2d 708, 712 (9th Cir. 1978) (If the opposing party "might have tried his case differently either by developing new facts in response to or advancing distinct legal arguments against the issue, [the issue] should not be permitted to be raised for the first time on appeal.").

On this record, bankruptcy court did not abuse its discretion in refusing to address contribution and subrogation. Therefore, and in keeping with the general rule "that a

federal appellate court does not consider an issue not passed upon below," *Singleton v. Wuff*, 428 U.S. 106, 120 (1976), the Court declines to address appellants' contribution and subrogation arguments.[6]

## CONCLUSION

The bankruptcy court's judgment is **AFFIRMED**.

DATED: February 13, 2013

B. Lynn Winmill
Chief Judge
United States District Court

---

[6] The Court also agrees with the bankruptcy court that appellants would face an uphill battle with this argument. Among other things, when David paid off the existing lien, Nichole had quit-claimed the property to him. He therefore owned the property as a sole owner, yet the contribution and subrogation theory assumes a co-tenancy. Additionally, if David is seeking contribution for a debt he paid off as a cotenant, he cannot have been "primarily liable" for that debt. *See In re A.D.S.T., Inc.*, 169 B.R. 64, 66 (Bankr. D. Idaho 1994). Here, David testified he and Nichole were "primarily liable" on the loan from Midland.